UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CECIL LEWIS, as Administrator of the Estate
of STEPHANIE LEWIS

               Plaintiff,

      -against-

NEW YORK CITY TRANSITY AUTHORITY,
et al.,

               Defendants.
------------------------------------------------------------x

<u>**MEMORANDUM AND ORDER**</u>

04-cv-2331 (SLT) (MDG)

**TOWNES, United States District Judge,**

       Substitute plaintiff Cecil Lewis, ("Mr. Lewis" or "plaintiff"), brings this action as administrator of the estate of former-plaintiff Stephanie Lewis, ("Lewis"), his deceased wife. Plaintiff alleges that the New York City Transit Authority ("the Transit Authority") discriminated against Lewis, formerly a Transit Authority bus driver, on account of her religion by transferring her to a bus depot and de facto terminating her employment for refusing to remove, cover with a cap, or affix a logo to her khimar, which is a headscarf worn by some Muslim women. The amended complaint alleges violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*; New York State and City Human Rights Laws, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), N.Y.C. Admin. Code § 8-107 *et seq.* ("NYCHRL"); 42 U.S.C. § 1983; the First and Fourteenth Amendments of the U.S. Constitution; and Article 1, Sections 8 and 11 of the New York State Constitution. The Transit Authority now moves for summary judgment. For the reasons set forth below, the Transit Authority's motion is denied in its entirety.

### Legal Standard

       Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. In determining whether there is a genuine issue of material fact, a court resolves all ambiguities and draws all justifiable inferences in favor of the non-moving party. *Id*. at 255.

The Second Circuit has cautioned that "[w]here an employer acted with discriminatory intent, direct evidence of that intent will only rarely be available, so affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gorzynski v. JetBlue Airways Corp*., 596 F.3d 93, 101 (2d Cir. 2010).

With that standard in mind, the pertinent facts, undisputed, or where disputed considered in plaintiffs' favor, are as follows:

## Background

### *Factual Background*[1]

The Transit Authority is the country's largest mass transit agency, employing about 45,000 people, including approximately 10,000 bus operators and 3,000 train operators. *United*

---

[1] The Court observes that the copies of plaintiff's opposition brief and Rule 56.1 statement submitted in the fully-briefed-motion packet via ECF on March 12, 2013 by defendant's counsel, Richard Schoolman, contained formatting errors and strange typographical features such as bolded words in odd places and multiple font types and sizes which were not, according to plaintiff's March 15, 2013 letter to this Court, in plaintiff's originals served on Defendants (in electronic format). In his March 18, 2013 letter, Mr. Schoolman did not respond to plaintiff's allegation that he altered plaintiff's submission, however based on the electronic documents that plaintiff subsequently filed with the Court, which were originally served on Defendants, that does appear to be the case. Defendant's counsel is advised that under this Court's Individual Practice, it is the movant's obligation to file an *unaltered* copy of plaintiff's opposition brief. Any further misconduct will result in sanctions.

*States v. New York City Transit Auth.*, 04-CV-4237, 2010 WL 3855191, at *1 (E.D.N.Y. Sept. 28, 2010). Lewis, a Muslim-American woman, was hired as a bus driver by the Transit Authority in 1989. (Pl.'s 56.1 Stmt ¶¶ 1-3.) She wore a khimar whenever she was in public, including at work. (*Id*. at ¶¶ 2-3.) When she was first hired, she provided a letter to her supervisors from her Imam explaining that her religion required that she keep all parts of her body except her face and hands covered. (*Id*. at ¶¶ 7-8.) Her khimar was the same color as her Transit Authority uniform, which consisted of blue pants and a blue shirt or sweater. (*Id*. at ¶ 9.) On her right sleeve, which was visible to passengers who boarded her bus, she wore a patch bearing the Transit Authority logo and a metal badge with her Transit Authority identification number. (*Id*. at ¶¶ 10-13.)

Until 2003, Lewis wore her khimar every day without incident. She received positive performance evaluations and was never reprimanded on account of her khimar. (*Id*. at ¶ 5.) From March 2002 until February 3, 2003, she was out on medical leave. While on leave, a union representative contacted Lewis seeking documentation about her khimar. She and another Muslim bus driver, together, provided a letter from their Imam to the union representative, which the representative, in turn, provided to the Transit Authority's General Superintendent Richard Dicciardello. (Pl.'s 56.1 Stmt. Ex. 1, December 10, 2008 Declaration of Stephanie Lewis ("Lewis Decl.") ¶ 9.)

### A. *Transit Authority Headwear Policies Governing Bus Operators*

The Transit Authority's uniform policies, including those governing headwear, were published in regular "Bulletins." The parties disagree about which policy governing bus drivers was in effect in February 2003. Lewis points to a Bulletin (Pl.'s 56.1 Stmt. Ex. 10) dated September 10, 2001, which was slated to expire on May 1, 2002, which states:

> **Depot logo caps are optional.**  Depot caps may only be worn with the bill of the cap facing forward.

(Pl.'s 56.1 Stmt. Ex. 10) (bolding in original).  The Transit Authority's attorney declares that: "According to the TA policy at that time, plaintiff could wear her khimar while operating a bus in passenger service but with a TA depot logo cap on top."  (Schoolman Decl. ¶ 8.)  The Transit Authority has not submitted any Bulletin or other written document supporting this contention.

The Transit Authority issued a Temporary Bulletin directed at bus drivers, dated April 28, 2003, which states:

> **Uniform hats/Depot logo caps**.  If an operator elects to wear any form of headwear, NYCT issued uniform hats, such as the depot logo caps, shall be worn (with the bill of the cap facing forward).

(Pl.'s 56.1 Stmt. Ex. 11) (bolding in original).

On November 17, 2003, the Transit Authority issued an updated Permanent Bulletin applicable to bus drivers, which is the earliest document submitted to the Court by the parties that expressly discusses religious headwear.  The detailed policy directs managers to strictly enforce the Transit Authority's policies, including the headwear policy, and to command any employee who refuses to cover his or her non-compliant headwear with a "depot logo cap" for religious reasons to "immediately visit the Depot AGM[] to discuss the matter."  (Pl.'s 56.1 Stmt. Ex. 12 at 2.)

### A.  *February 12, 2003 Transfer to Bus Depot*

On February 6, 2003, when Lewis returned from medical leave, she was told at a required refresher training class "in a loud voice and rude tone" that her khimar violated the Transit Authority's headwear policy, and she was required to either remove it or cover it with a hat. (Lewis Decl. ¶ 11)  When she refused to either remove or cover her khimar, she was asked to leave the training.  Later that day, she met with Dicciardello and a union representative.  At that

meeting, she was told that a "new" Transit Authority policy required her to either remove her khimar or wear a baseball hat that read "Flatbush Depot Brooklyn Division" over her khimar. (*Id*. at ¶¶ 13-14; *see also* Pl.'s 56.1 Stmt. Exs. 2-4, Jan. 26-27, 2005 & Nov. 16, 2005 Deposition of Stephanie Lewis ("Lewis Dep.") at 118-19.) Although Lewis requested to see the new policy, she was never provided with any documentation of the policy effective in February 2003. (Pl.'s 56.1 Stmt at ¶ 33.)

On February 11, 2003, Lewis's first day back as a bus driver, dispatcher Richard Herman boarded Lewis's bus and issued Lewis a "Violation of Rules" for wearing "improper unauthorized headgear" and "refus[ing] to put proper headwear on." (Lewis Decl. ¶¶ 17-19.) Herman testified that he was directed by his supervisor to check on Lewis and that he did not want to issue a violation but that "they were forcing [him] to give her a violation." (Pl.'s 56.1 Stmt. Ex. 67 51:21-53:12.)

The next day, February 12, 2003, Lewis again reported to work wearing her khimar and not wearing a Transit Authority baseball hat on top of it. Rather than be permitted to work, she was directed to again meet with Dicciardello, a union representative, and another Transit Authority supervisor. At that meeting, she was again directed to remove her khimar or cover it with a hat. When she refused and explained that "doing so would violate my [Lewis's] religious beliefs," she was told she would no longer be permitted to work in "passenger service," *i.e*., in view of passengers. (Lewis Decl. ¶ 20.)

That day (February 12, 2003), Lewis was involuntarily transferred from her position as a bus driver and reassigned to work in the bus depot where the headgear policy did not apply because she would be out of the view of passengers. There, she worked with three other female Muslim bus operators who were transferred to the depot after refusing to remove or cover their

khimars – Malikah Alkebulan, Deirdre Small, and Gladys Muhammad (a/k/a Gladys Wilson). (Pl.'s 56.1 Stmt. Ex. 55 ¶ 16(d); *United States v. New York City Transit Auth.*, 04-CV-4237, 2010 WL 3855191, at *3 (E.D.N.Y. Sept. 28, 2010)).  A Sikh subway train operator who refused to remove his turban was also transferred out of "passenger service."  (Pl.'s 56.1 Stmt. Ex. 55 ¶ 20.)

Plaintiff contends that other bus operators who violated the Transit Authority's headwear policy were not monitored or disciplined in the same manner as Lewis and other female Muslim bus drivers.  For example, "after the terrorist attacks of September 11, 2001, many bus operators began wearing FDNY hats to work on a regular basis and continued to do so until mid- to late-2002 … [and were never] harassed, monitored or written up by [Transit Authority] supervisors." (Pl.'s 56.1 Stmt. ¶ 25.)  Moreover, a study conducted by the United States Department of Justice ("DOJ") revealed, over 11 hours of observation, "more than 300 instances of TA uniformed employees … openly violating TA uniform policies.  Significantly, 208 TA subway and bus employees were observed working in passenger service wearing head coverings with no visible TA logo or patch, including 103 Russian-style winter hats, 62 knit hats (plain and with brand logos, such as North Face and Columbia Sportswear), six NY Yankees/Mets hats, a variety of baseball hats (including 13 plain, one with an eagle logo, and one with a New York City skyline patch[),] three head bands, eight conductor-style hats, one beret, two kufis, one head scarf/"doo rag" and one fur hat[.]"  (Pl.'s 56.1 Stmt. Ex. 95 at 2.)

At the bus depot, Lewis was initially assigned janitorial tasks and then given the task of "shifting" empty buses between depots throughout the city and vacuuming the fare boxes.  As a result, she was deprived of seniority – a benefit that accrues to Transit Authority employees and allows them to control their shifts, hours, routes, and access to overtime.  (Pl.'s 56.1 Stmt. ¶¶ 45-

47.) With more than 13 years' seniority as a bus driver, Lewis had had significant control over her schedule and routes. Once transferred, she lost the benefit of her seniority, and with it, control of her schedule, access to her preferred bus routes, and overtime. (*Id*.) As a result, she also lost approximately 10-20 hours of overtime pay per week. (*Id*.; Decl. of Authur Z. Schwartz, General Counsel of Local 100 at ¶ 6.)

Lewis described working in the bus depot as "stressful, hectic and unpredictable;" she performed janitorial tasks such as washing windows and cleaning buses – tasks not typically performed by bus drivers. (Lewis Decl. ¶¶ 27-28.) The bus depot was "full of noxious fumes." (*Id*. at 33.) Additionally, her supervisors told her that her colleagues were resentful of her because her position was created by taking away overtime opportunities from other Transit Authority employees. (*Id*. at ¶ 32.) Lewis was required to sign in and out of work on sign-in sheets that were made only for female Muslim employees when she arrived, took a meal break, or left work, while non-Muslim bus operators were not subjected to this requirement. (*Id*. at ¶ 29.) She also was required to seek permission for bathroom breaks – a requirement reserved only for her. (*Id*.) In July 2003, supervisor Billy Pellitier told her that she and other Muslim women were assigned less desirable janitorial tasks and not permitted to select their tasks, as other employees at the depot were permitted to do, because they made a choice to work in the depot by refusing to compromise their religious beliefs. (Pl.'s 56.1 Stmt. at ¶ 57.) On October 24, 2003, in the presence of other Transit Authority employees, a dispatcher named Benny Pecorino, told Lewis that she should "work at Wendy's because 'they wouldn't mind that rag on [her] head.'" (Lewis. Decl. ¶ 31.)

### B. April 3, 2003 Union Grievance

Lewis filed a grievance with Amin Khan, Vice President of the Transit Workers Union 100 on April 3, 2003 against a supervisor, Steve LoPiano, at the bus depot for harassment, humiliation, retaliation, and hostile work environment. (Pl.'s 56.1 Stmt. ¶ 55.) Plaintiff does not indicate whether LoPiano's conduct was motivated by religious animus, and she has not submitted a copy of the grievance. Plaintiff contends that the Transit Authority did not remedy the situation and she continued to be subject to harassment. (*Id.*)

### C. October 27, 2003 Injury and October 27, 2004 Reclassification as a Station Agent

On October 27, 2003, Lewis tripped over a fare box hose while cleaning a bus and sustained serious injuries. (Lewis Decl. ¶ 38.) As a result, she was unable to perform her duties and took a medical absence. (*Id.*) She was notified that she would be terminated after a one-year cumulative absence on October 27, 2004, unless she returned to work or sought reclassification. (Pl.'s 56.1 Stmt. Ex. 22.) On September 17, 2004, Lewis sought reclassification, and, after completing a medical examination, on October 27, 2004, she was notified that she was qualified for the position of "Station Agent," working in a token booth, but there were no vacancies available. (Lewis Decl. ¶ 45.)

### D. Station Agent Bulletins dated November 15, 2004 and March 29, 2005

Shortly after Lewis received notice that she could be reclassified as a station agent and return to work, a Bulletin, dated November 15, 2004, was issued which states the following:

> All Division of Stations' employees are hereby advised that uniform options have been expanded to include garments in uniform color that can be worn as turbans or khimars and can be used as substitutes for the TA issued cap. No other headwear is required over these garments and they are permitted to be worn in customer service. The headscarf khimar garment will come with an MTA logo already affixed to it. The larger garment (that can be worn as a turban) will come with an MTA logo to be pinned to it when the wearer is in customer service.

The bulletin does not indicate where the Transit Authority logo is affixed on the khimar.

(Schoolman Decl. ¶ 3 and Ex. O). This policy was reiterated in a "Uniform Dress Code" Bulletin dated March 29, 2005. The Bulletin states that:

> Only NYCT issued uniform hats, or other specified NYCT-issued or NYCT-approved headwear shall be worn. Alternatively, a uniformed employee may wear … [a] headscarf or khimar made of NYCT-provided blue cotton fabric with an assigned logo affixed to the front, in center…. Managers and Supervisors must monitor this directive for strict compliance.

(Pl.'s 56.1 Stmt. Ex. 16 at 3.) The Bulletin also includes a black and white illustration of a woman wearing a khimar with a circular patch reading "MTA" affixed to the part of her khimar that covers her forehead. *Id*. at 4. Lewis contends that this was the first time she learned that the Transit Authority logo affixed to her khimar would have to be placed on her forehead. (Pl.'s 56.1 Stmt. ¶ 75.)

### A. December 14, 2004 Social Security Disability Application

After learning that there was no position for her as a station agent and because she was unable to perform her job in the depot, Lewis submitted an application for Social Security Disability Insurance ("SSDI") on December 14, 2004. (Lewis Decl. ¶ 66; Pl.'s 56.1 Stmt. Ex. 45.) In her application, she stated that she was a bus operator and suffered an injury rendering her unable to continue that work. (*Id*.) Specifically, she stated that as of October 28, 2003, "back pain, hip pain, thigh pain, diabetes, [and] sleep problems" limit her ability to continue her work, *i.e.*, "driv[ing] a bus," because "activity increases my symptoms." (Pl.'s 56.1 Stmt. Ex. 45 at 2.) On April 19, 2005, the Social Security Administration awarded Lewis $1,418.00, monthly. (Pl.'s 56.1 Stmt. Ex. 47.)

### B.  April 2005 Station Agent Position

On February 18, 2005, the Transit Authority conducted a second medical evaluation of Lewis and again found her medically qualified for reclassification to station agent.  (Pl.'s 56.1 Stmt. ¶ 68.)  A station agent position was now available.  (*Id*.)

Lewis began a nineteen-day training program to reclassify as a station agent on April 4, 2005.  (*Id*. at ¶ 74.)  Superintendent Yolande Tonge was instructed to monitor Lewis's compliance with the headwear policy.  (*Id*. at ¶ 82.)  During the training, Lewis was repeatedly asked by Tonge and other supervisors to affix a Transit Authority logo to the part of her khimar that covers her forehead. and Lewis repeatedly refused, explaining that, per her religious beliefs, placing anything on the part of her khimar that covers her forehead would interfere with her prayers, during which she must touch her forehead to the ground.  (*Id*. at ¶ 77; Pl.'s 56.1 Stmt. Ex. 32; Lewis Decl. ¶ 50.)  On April 27, 2005, while in a booth during field training, Tonge yelled at Lewis in front of other Transit Authority employees for not wearing the Transit Authority logo on her forehead.  (Lewis Dep. 331:18-332:11; Pl.'s 56.1 Stmt. ¶ 83.)  Lewis was sent home for the rest of the day for refusing to remove her khimar or affix a TA logo to it. (Lewis Dep. at 334:16-23.)

On April 28, 2005, Lewis completed her training and was certified as a station agent.  (*Id*. at 349:2-13.)  The following day, on April 29, 2005, when Lewis arrived for her first shift as a station agent, she did not have a Transit Authority logo affixed to her forehead.  (Pl.'s 56.1 Stmt. at ¶ 87.)  Transit Authority officials immediately tendered a letter terminating her from her station agent position and transferring her back to her position as a bus driver even though they were aware she was medically unable to perform that job.  (*Id*.)  The letter explains that: "… you were unable to comply with all aspects of the Station Agent position, including NYC Transit's

uniform policy. You have not stated that you cannot comply with that policy. As such, you have not met the conditions for reclassification[,] … your reclassification will be rescinded and you will be returned to your permanent title, Bus Operator …." (Pl.'s 56.1 Stmt. Ex. 34.) All of Lewis's medical and healthcare benefits were cancelled as of April 2005, following her April 29, 2005 "termination." (Pl.'s 56.1 Stmt. ¶ 111.)

### C. June 14, 2005 Termination

After rescinding Lewis's reclassification as a station agent, the Transit Authority conducted yet another medical evaluation for the purposes of reclassifying Lewis on June 3, 2005. (Pl.'s 56.1 Stmt. ¶ 99.) A June 6, 2005 "RW/Reclassification Title Transfer Form" indicates that Lewis was not medically qualified for reclassification to another position at the Transit Authority, although it does not state whether she could have served as a station agent. (Decl. of Suzanne L. Lim, M.D., Ex. A at 5.)

On June 14, 2005, the Transit Authority sent Ms. Lewis a notice of termination, which provides, in part, the following:

> On April 29, 2005, your reclassification to the title of Station Agent was rescinded based on your stated unwillingness to comply with all the conditions of reclassification to that title. On June 6, 2005, as a result of a second reclassification medical examination, you were found medically unqualified for reclassification to another title.
>
> Accordingly, you are hereby notified that … your employment has been terminated effective June 6, 2005….

(Pl.'s 56.1 Stmt. Ex. 38.) At the time Lewis was terminated, she had already commenced the instant action, which was in arbitration. Lewis was "rehired" at the direction of the arbitrator on "unpaid status" and without any benefits. (Pl.'s 56.1 Stmt. ¶¶ 103, 107-108) The parties agree that, as of August 8, 2005, Lewis was "unterminated," but without any responsibilities and

without pay.  (*Id*.)  Her benefits were not restored and she never received another paycheck.  (*Id*. at ¶ 111.)

Lewis died on February 25, 2012.  (*Id*. at ¶ 114.)  Shortly after her death, the Kings County Surrogates Court granted the appointment of her husband, Cecil Lewis, as administrator of Lewis's estate.  (*Id*. at 131.)  The Surrogates Court extended the Letters of Temporary Administration to August 13, 2013.  (Pl.'s 56.1 Stmt. Ex. 91.)[2]

*Procedural History*

### A.  *Equal Employment Opportunity Commission Charge of Discrimination*

Lewis filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 4, 2003.  In the box for the earliest date of discrimination, Lewis wrote "February 5, 2003 to Present."  An attached addendum reads, in relevant part:

> I have been employed by Respondent since March 27, 1989 … [as a] Bus Operator.  My performance evaluations have always been without incident.
>
> On February 6, 2003, I returned to work after having been on disability leave. I attended a required … recertification course … [where] I was approached by Superintendent Curan about my Khimar … [and told] that I would have to remove my Khimar or where [*sic*] the hat issued by Respondent. … Later on February 6, 2003, I met with General Superintendent Richard Dicciarello and Union Chair person Althea Carter … [who] stated that I would not have to wear the issued hat while in class, however I would be required to wear it while driving the bus. Dicciarello gave me a hat to wear over my Khimar [and] told me if it didn't fit he'd have me fitted for one that did.  I asked if there was any documentation available about the hat. …
>
> I reported to work on February 11, 2003[.]  Dispatcher Richard Herman boarded the bus I was operating [and] … stated that he was sent out to see if I was wearing the hat and I was not. I was written up … for not wearing the hat.

---

[2] Cecil Lewis's appointment was current as of the date that the fully-briefed motion for summary judgment was filed with the Court on March 12, 2013.  (Dkt. No. 163.)  There is no indication there would be any obstacle to renewing Mr. Lewis's Temporary Administration for the duration of this litigation.

> [On] February 12, 2003[,] I reported to work and Dispatcher Horseford asked me to take a seat until Dicciarello arrived. A meeting was held with Dicciarello, Carter and Vice Chairperson of the Flatbush depot Carlos, they informed me that I would be removed from driving the bus for not wearing the issued hat. Since February 12, 2003 I have not been allowed to drive a bus where I am picking up passengers.
>
> I believe I have been discriminated against based on my sex, female and religion (Muslim) in that I have experienced disparate treatment as a Muslim female by Respondent. Despite Respondents [*sic*] contention that the issued hat is optional, Muslim females are the only individuals made to wear the optional hat. Based on my own information and belief there are male Bus Operators that do not where [*sic*] the issued hats.

(Pl.'s 56.1 Stmt. Ex. 43.) On her EEOC Intake Questionnaire, Lewis also stated that she was harmed on "2-5-2003." (Pl.'s 56.1 Stmt. Ex. 42.)

On March 4, 2004, the EEOC found that her claims were untimely. (Pl.'s 56.1 Stmt. Ex. 46.) Her attorney wrote a letter to the EEOC, dated March 12, 2004, explaining that her claims were not untimely because her adverse employment action – being removed from driving a bus based on her religious beliefs and gender – took place on February 12, 2003 and her EEOC charge was filed on December 4, 2003 "well within the required 300 day[s]." (Pl.'s 56.1 Stmt. Ex. 44 at 2.)

### B. Instant Lawsuit

On June 4, 2004, Lewis commenced this action and filed a complaint. On March 23, 2006, Lewis filed her amended complaint alleging discrimination in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. S 2000e *et seq.*), New York State and City Human Rights Laws, and under the First and Fourteenth Amendments of the U.S. Constitution, on account of her religion when the Transit Authority (1) on February 12, 2003, removed her from passenger service duties to the bus depot for refusing to remove or cover her khimar and (2) on April 29,

2005, denied her reclassification as a Station Agent when she refused to remove or cover her khimar or affix a Transit Authority logo to her forehead.[3]

### C. Related Actions

A number of other Muslim women, a Sikh man, and the DOJ brought suits in this Court challenging the Transit Authority's policies on religious headwear. *See Small and Alkebulan v. New York City Transit Auth.*, Dkt. No. 03–CV–2139 (SLT); *Muhammad v. New York City Transit Auth.*, Dkt. No. 04–CV–2294 (SLT); *United States v. New York City Transit Auth.*, Dkt. No. 04-CV-4237 (SLT); *Harrington v. Reuter*, Dkt. No. 05–CV–3341 (SLT). Final judgment has been entered in all of these actions except *Muhammad v. New York City Transit Auth.*, Dkt. No. 04–CV–2294 (SLT).

### D. Instant Motion for Summary Judgment

The Transit Authority now moves for summary judgment asserting a cornucopia of arguments, each of which is discussed in detail below. In brief, it asserts that it is entitled to judgment as a matter of law on Lewis's claims arising out of her involuntary transfer to the bus depot and *de facto* termination from the position of station agent because the claims were not timely brought before the EEOC and otherwise fail as a matter of law. The Transit Authority also brings a host of miscellaneous arguments, arguing that judicial estoppel results from Lewis's SSDI application, seeking a cut-off for damages in light of Lewis's medical disqualification, and alleging that Lewis failed to mitigate damages.[4] Plaintiff responds that Mr. Lewis is a proper

---

[3] Lewis also named individual Transit Authority employees as defendants, but plaintiff voluntarily dismissed them from the action on February 19, 2013, (Dkt. No. 160.) Lewis also asserted claims for conspiracy to discriminate and discrimination on the basis of gender, which plaintiff also voluntarily dismissed. *Id*.

[4] In its opening brief, the Transit Authority also argued, without citation, that the death knoll tolled for this case when Mr. Lewis's status as administrator of his deceased wife's estate

party, that plaintiff has established a *prima facie* case of disparate treatment, failure to

accommodate, disparate impact, retaliation, and violations of the First Amendment Free Exercise

and Free Speech clauses. For the following reasons, the Transit Authority's motion is denied in

its entirety.

**Discussion**

### I.       *Judicial Estoppel*

The Transit Authority argues that plaintiff is judicially estopped from asserting claims

arising out of Lewis's termination as a station agent. (Def.'s Br. at 10.) It contends that by

applying for SSDI, Lewis represented to the Social Security Administration that she was "unable

to do any 'substantial gainful work … in the national economy,'" (Def.'s Br. at 10, citing 42

U.S.C. § 423(d)(2)(A)), and now cannot take the contrary position, in this litigation, that she was

qualified to work as a station agent.

Judicial estoppel generally prevents a party who has assumed a certain position in a legal

or administrative proceeding from thereafter assuming a contrary position. It applies to sworn

statements made to administrative agencies, such as the Social Security Administration in SSDI

proceedings. *Cleveland v. Policy Management Systems Corp.,* 526 U.S. 795, 802 (1999).

---

temporarily lapsed. (Def.'s Br. at 9.) Although, on reply, the Transit Authority indicated that it
will no longer pursue this argument, (Def.'s Reply Br. at 3 n.6), the Court nevertheless addresses
it because the defect alleged is jurisdictional. *See Freidus v. ING Grp. N.V.*, 09 CIV. 1049 LAK,
2012 WL 4857543, *1 (S.D.N.Y. Oct. 11, 2012) *aff'd*, 12-4514-CV, 2013 WL 6150769 (2d Cir.
Nov. 22, 2013) (granting motion to dismiss for lack of subject matter jurisdiction on the ground
that "no plaintiff remains who has standing to pursue any of the claims asserted.") Shortly after
his wife's death, on April 24, 2012, the Kings County Surrogate Court granted Mr. Lewis's
application to be appointed administrator of his wife's estate – a status which was slated to
expire on October 24, 2012. Mr. Lewis, as administrator of his wife's estate, was substituted as
plaintiff. (Dkt. No. 130.) Two and a half months after his status expired, on February 13, 2013,
the Kings County Surrogates Court retroactively extended the April 24, 2012 Letters of
Administration through August 13, 2013. Thus, as of the date that this fully-briefed motion was
filed with the Court, (March 12, 2013), Mr. Lewis was the administrator of his wife's estate and
a proper party to continue this action. Accordingly, there is no jurisdictional defect.

However, "the mere fact that a plaintiff files for social security benefits (and thus, represents herself to be disabled) does not create a presumption that she is unable to perform the essential functions of her job…." *DeRosa v. Nat'l Envelope Corp.,* 595 F.3d 99, 103 (2d Cir. 2010). Rather, the doctrine only constrains a party from taking a position that is "clearly inconsistent" with its earlier position. *Id.* It has no application where apparently conflicting statements can be reconciled. *Compare id.* at 102–04 (holding that the plaintiff's factual statements about what he could and could not do on his SSDI application did not contradict his assertion in a lawsuit that he could work with a reasonable accommodation); *with Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 7 (2d Cir. 1999) (holding that the plaintiff was precluded in a lawsuit from asserting that he could walk and stand when he had asserted to the Social Security Administration that he could not walk or stand). The Second Circuit has cautioned that "a court must carefully consider the contexts in which apparently contradictory statements are made to determine if there is, in fact, direct and irreconcilable contradiction." *Rodal v. Anesthesia Group of Onondaga*, 369 F.3d 113, 119 (2d Cir. 2004).

Here, there is no direct and irreconcilable contradiction. Lewis represented in her SSDI application that due to "back pain, hip pain, thigh pain, diabetes, [and] sleep problems," (Pl.'s 56.1 Stmt. Ex. 45), she was unable to work as a bus driver. She made no mention of whether she could work as a station agent. Thus, judicial estoppel does not bar her from asserting claims for discriminatory rescission of her station agent position.

## II. *Lewis's Alleged Failure to Mitigate Damages*

The Transit Authority argues that Lewis' claims arising out of the Transit Authority's refusal to allow her to work as a station agent are barred by her failure to mitigate damages after the Transit Authority rescinded her reclassification to Station Agent on April 29, 2005 and

subsequently terminated her from her position as a bus driver because she was medically disqualified from performing that job. (Def.'s Br. at 11.) This position is baffling in light of the Transit Authority's contention that Plaintiff was "employed" by the Transit Authority until her death. As the Transit Authority explains, "[b]ased upon a directive by Richard Adelman, the arbitrator in a related matter, the [June 14, 2005] termination of Ms. Lewis's employment was rescinded by letter, dated August 8, 2005; and until her death in 2012, Ms. Lewis remained in the title of bus operator at the [Transit Authority], although she never again performed actual work at the [Transit Authority]." (Def.'s Br. at 7.) Since Lewis was "employed" by the Transit Authority, she had no obligation to mitigate her damages by seeking additional employment.[5]

## III.    *Lewis's Alleged Failure to Comply with EEOC Requirements*

### A. *Timely EEOC Charge*

"Exhaustion of administrative remedies through the EEOC is an essential element of the Title VII … statutory scheme[] and, as such, a precondition to bringing [a Title VII claim] in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.,* 274 F.3d 683, 686 (2d Cir. 2001) (per curiam). The purpose of the exhaustion requirement—namely, to encourage settlement of

---

[5] In any event, the Transit Authority has not met its burden to demonstrate that Lewis did not make reasonable efforts to find alternative employment. A "prevailing plaintiff in a Title VII [discriminatory termination] case must attempt to mitigate her damages…." *Dailey v. Societe Generale*, 108 F.3d 451, 455 (2d Cir. 1997). It is the *employer* who must prove either: (1) "that suitable work existed, and[]that the employee did not make reasonable efforts to obtain it," *Broadnax v. New Haven,* 415 F.3d 265, 268, 270 (2d Cir. 2005), or (2) that "the employee made no reasonable efforts to seek such employment," regardless of whether suitable alternatives were available, *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 53-54 (2d Cir. 1998). The Transit Authority does not attempt to prove the former. To prove the latter, the Transit Authority must do more than point to Lewis's ambiguous deposition testimony. Lewis testified that she had not applied to other positions because she was hoping to return to the Transit Authority. (Def.'s Br. at 11 n.36, citing Pl.'s 56.1 Stmt. Ex.4, Lewis Dep. 416-417.) As in *Broadnax*, this testimony "could mean either that she had not sought other employment, or she tried and failed," and thus does not establish that the Lewis failed to make any reasonable efforts to mitigate her damages. *Broadnax*, 415 F.3d at 270.

discrimination disputes through conciliation and voluntary compliance—would be defeated if a plaintiff could litigate a claim not previously presented to the EEOC. *See Miller v. Int'l Tel. & Tel.,* 755 F.2d 20, 26 (2d Cir. 1985). Accordingly, failure to file a timely administrative charge with the EEOC extinguishes the claim and prohibits recovery. In New York, which has both state and local fair employment agencies, an individual who initially files a grievance with the state or local agency must file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). Failure to file an administrative charge with the EEOC within the 300 days extinguishes the claim and prohibits recovery. *Butts v. New York Dep't of Hous. Preservation & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993).

The Transit Authority argues that Lewis's EEOC charge of discrimination, filed 295 days after she was transferred to the bus depot on February 12, 2003, is time barred because, although it is dated December 4, 2003, the "*Notice* of Charge of Discrimination" that the Transit Authority received from the EEOC was dated December 10, 2003. (Moll Decl. Ex. E.) Alternatively, the Transit Authority seems to argue that Lewis could not have filed her charge, ending in the digits '673 on December 4, 2003 because the Transit Authority received a charge of discrimination from a different employee, dated December 10, 2003, ending in sequentially lower digits: '672. This, the Transit Authority argues, "indicat[es] that Ms. Lewis's charge was received by the EEOC *after* it received [the other employee's] charge on December 10, 2003…." (Def.'s Br. at 18.) It is clear from the record that Lewis filed her EEOC charge of discrimination on December 4, 2003. Not only is her charge of discrimination dated December 4, 2003, but an Intake Questionnaire signed by EEOC Investigator is also dated December 4, 2003. (Pl.'s 56.1 Stmt. Exs. 42, 43.) The Transit Authority has not introduced any evidence suggesting that another

employee's charge number is, in any manner, probative of when Lewis filed her charge with the EEOC. Accordingly, Lewis's charge of discrimination based on her reassignment to the bus depot was timely filed with the EEOC.

### B. Reasonably Related

The Transit Authority argues that, even if her charge was timely filed, Lewis's failure to file a second charge to exhaust the April 29, 2005 rescission of her reclassification as Station agent and concomitant transfer back to the bus depot renders her claims arising out of those actions unreviewable.

A district court may only review Title VII claims that were either contained in the EEOC charge or are reasonably related to claims in the charge. *Legnani*, 274 F.3d at 686. "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice,'" and "each discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

In *Butts*, the Second Circuit recognized three circumstances in which claims not explicitly raised in an EEOC charge could nonetheless be considered by a district court. 990 F.2d at 1402.[6] Only the third is relevant here.[7] It arises "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC

---

[6] *Butts* was superseded by statute on other grounds as recognized by *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998).

[7] The first such circumstance arises when the facts in the charge lodged with the EEOC would have prompted the EEOC to investigate the unexhausted claim, or in other words, the claim would "reasonably be expected to grow out of the charge" that was made. *Id*. (quoting *Smith v. Am. President Lines, Ltd*., 571 F.2d 102, 107 n. 10 (2d Cir. 1978)). The second circumstance in which a claim not previously raised in an EEOC charge may be permitted to be raised in subsequent litigation arises when the new claim alleges retaliation by the employer against the employee for having filed the EEOC charge itself. *Id*. at 1402.

charge." *Id*. at 1402-03 (citing *Almendral v. N.Y. State Office of Mental Health*, 743 F.2d 963, 967 (2d Cir. 1984)). The Second Circuit explained:

> Such an incident might not fall within the scope of the EEOC investigation arising from the charge, since it might occur after the investigation was completed … [h]owever, the values associated with exhaustion are not entirely lost because the EEOC would have had the opportunity to investigate, if not the particular discriminatory incident, the method of discrimination manifested in prior charged incidents. The fact that a charge alleging the same method was not resolved by the EEOC to the plaintiff's satisfaction makes it more likely that a new charge alleging the later incident would meet the same fate. Our holding that such conduct is 'reasonably related' implicitly recognizes the cost to a plaintiff of requiring exhaustion in circumstances where the likelihood of a successful settlement is limited.

*Id*. at 1403. In *Almendral*, in which plaintiff alleged that she was passed over for promotions on numerous occasions on account of her race, the Second Circuit held that incidents that occurred after plaintiff had filed her EEOC charge were "essentially the same" as the conduct identified in her EEOC complaint, even though the incidents involved different schemes to exclude plaintiff from consideration, ranging from deflated performance reviews to delays in adding her name to 'promotion-ready' lists, because they all involved the "alleged manipulation of the civil service rules for discriminatory reasons in order to appoint someone other than [plaintiff]." *Almendral*, 743 F.2d at 967; *see also Hinton v. City Coll. of New York*, 05 CIV. 8951 (GEL), 2008 WL 591802, at *14 (S.D.N.Y. Feb. 29, 2008) (explaining that plaintiffs should not be prevented "from raising … functionally identical issues in their lawsuit … simply by slight[] var[iations in] the exact means of discrimination. That an employer uses different pretexts to [discriminate against a plaintiff] year after year as part of a regular policy of discrimination does not require the victim to file repeated EEOC charges and repeated separate lawsuits.")

The Transit Authority contends that Lewis was required to lodge a second charge of discrimination with the EEOC when the Transit Authority rescinded her station agent

reclassification. However, the first charge of discrimination that she lodged with the EEOC alleged an incident of discrimination – transfer to the bus depot for refusing to remove or cover her khimar – that was carried out in "precisely the same manner," *i.e.*, Lewis was ready to perform her duties, wearing her khimar, and rather than permit her to work in a position in which she might be seen by the Transit Authority's customers, she was sent to work at the bus depot. Just because the mechanism for this transfer – first an intra-department transfer and then rescission of reclassification – differs slightly, does not alter this Court's analysis. Accordingly, Lewis's claims are timely and properly exhausted, and summary judgment on these grounds is denied.

IV. ***Plaintiff's Title VII, NYSHRL and Equal Protection Claims Do Not Fail as a Matter of Law***

Plaintiff complains of four distinct types of discriminatory treatment – disparate treatment, disparate impact, failure to accommodate, and retaliation – in violation of Title VII, NYSHRL and Equal Protection.

Title VII prohibits employment discrimination on the basis of, *inter alia*, religion. Specifically, an employer may not "fail or refuse to hire or ... discharge any individual, or otherwise ... discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion," 42 U.S.C. § 2000e-2(a)(1), or "limit, segregate or classify" an employee in a way that would "adversely affect his status as an employee," because of that employee's "religion." 42 U.S.C. § 2000e–2(a)(2), § 703(a)(2). It "prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009). It also affirmatively requires employers to "make

21

reasonable accommodations, short of undue hardship, for the religious practices of … employees and prospective employees," *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006) (citing *Trans World Airlines. Inc. v. Hardison,* 432 U.S. 63, 74 (1977)), and prohibits employers from retaliating against employees for their good faith opposition to discriminatory conduct, 42 U.S.C. § 2000e-3(a). *See also Weber v. City of New York*, 11-CV-5083 MKB, 2013 WL 5416868, at *12 (E.D.N.Y. Sept. 29, 2013) (observing that a plaintiff alleging religious discrimination in violation of Title VII may simultaneously proceed under a theory of disparate treatment and denial of reasonable accommodations).

Plaintiff's NYSHRL and Equal Protection claims are analyzed in tandem with plaintiff's Title VII claims because "[t]he standards for liability under these laws are the same as those under the equivalent federal anti-discrimination laws." *Ferraro v. Kellwood Co.,* 440 F.3d 96, 99 (2d Cir. 2006); *Simmons v. Akin Gump Strauss Hauer & Feld, LLP*, 508 F. App'x 10, 12 (2d Cir. 2013) (unpublished) (explaining that Title VII and NYSHRL employment discrimination claims are analyzed in tandem); *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004) ("[plaintiff's] equal protection claim parallels his Title VII claim. The elements of one are generally the same as the elements of the other and the two must stand or fall together.").[8]

### A. Disparate Treatment

Disparate treatment on the basis of religion is prohibited by Title VII and NYSHRL. 42 U.S.C. § 2000e–2(a); N.Y. Exec. Law § 296. Such claims require that a plaintiff "establish that the defendant had a discriminatory intent or motive for taking a job-related action." *Ricci*, 557 U.S. at 576. Generally, disparate treatment claims under Title VII, NYSHRL and the Equal

---

[8] *See also Bowles v. New York City Transit Auth.*, 00 CIV. 4213 BSJ MHD, 2006 WL 1418602, at *7 (S.D.N.Y. May 23, 2006) *aff'd*, 285 F. App'x 812 (2d Cir. 2008) (unpublished) (observing that claims of religious discrimination brought under Title VII are analyzed in tandem with analogous NYSHRL claims).

Protection Clause are analyzed under the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973), and its progeny, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-07 (1993) and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). *Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004) (applying *McDonnell Douglas* framework to Equal Protection claims); *Simmons*, 508 F. App'x at 12 (NYSHRL claims are analyzed under *McDonnell Douglas* framework). Under *McDonnell Douglas,* plaintiff must first make out a *prima facie* case, *i.e.,* she must demonstrate that (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). The plaintiff's burden of proof at the *prima facie* stage "is not onerous," *Burdine*, 450 U.S. at 253, because "[c]ourts recognize that most discrimination and retaliation is not carried out so openly as to provide direct proof of it," *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004). Once the *prima facie* case has been shown, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. The burden then shifts back to the plaintiff "to show that [the defendant's] stated reason for [the adverse employment action] was in fact pretext." *Id*. at 804.

Here, it is undisputed that Lewis, a Muslim, belongs to a protected class and was qualified to work as a bus driver and station agent. As to her claims arising out of the 2003 transfer to the bus depot, the Transit Authority argues that Lewis was not subject to any adverse employment action as a result of religious animus. As to her claims arising out of the 2005 rescission of her station agent reclassification and transfer back to the bus depot, the Transit

Authority contends that its rescission of her station agent position was justified because Lewis refused to comply with the requirements of the position, namely the uniform requirement. (Def.'s Br. at 12-13, 20-21.)

### i. 2003 Transfer to Bus Depot

As of February 12, 2003, when Lewis was transferred to the bus depot, it is undisputed that she was a member of a protected class (a Muslim), qualified to be a bus driver (a position she had held for roughly 14 years), and was transferred to the bus depot for refusing to remove or cover her khimar. However, the Transit Authority disputes that plaintiff was subject to an adverse employment action; working in the bus depot, the Transit Authority argues, "was generally viewed as a desirable assignment[] and had no negative effect on the employee's future career at the [Transit Authority.]" (Def.'s Br. at 21.)

An adverse employment action is "a materially adverse *change* in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78-79 (2d Cir. 2008) (quoting *Sanders*, 361 F.3d at 755 (emphasis in *Mathirampuzha*)). The Second Circuit has explained that:

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Id*. (quoting *Sanders*, 361 F.3d at 755). An internal transfer can constitute an adverse employment action if "accompanied by a negative change in the terms and conditions of employment," *Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003) (internal citations omitted), or "if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 641, (2d Cir. 2000).

Here, Lewis was transferred from a position as a bus driver with significant seniority, to a position shifting and cleaning buses in the bus depot, where she could not use her seniority. Compared with working as a bus driver, Lewis described working in the bus depot as "stressful, hectic and unpredictable." (Lewis Decl. ¶ 27.) The depot was full of "noxious fumes" and she was required to perform janitorial tasks. (*Id*. at ¶¶ 28-33.) Her coworkers displayed overt animosity against her. (*Id*.) For example, a coworker referred to her khimar as a "rag." (*Id*. at ¶ 33.) She was required to sign in and out of work when she arrived, took a meal break, or left work on sign-in sheets that were made only for female Muslim employees, and was required to seek permission for bathroom breaks. (*Id*. at ¶ 29.)[9] At the very least, there is a genuine question of fact whether the transfer to the bus depot and change in duties constituted an adverse employment action. *See*, *e.g.*, *Lore v. City of Syracuse*, 670 F.3d 127, 170-01 (2d Cir. 2012) (finding that jury should decide whether series of transfers without change to salary or rank, from position as public information officer where plaintiff dealt with media and was spokesperson for police department to a variety of positions that she testified were less desirable were adverse employment actions); *Brady v. Wal–Mart Stores, Inc.,* 531 F.3d 127, 134 (2d Cir. 2008) (finding evidence of a "transfer [that] did not affect [the plaintiff's] wages or benefits, [but] resulted in a 'less distinguished title' and 'significantly diminished material responsibilities,'" is "sufficient evidence for the jury to conclude" that the transfer "constituted an adverse employment action"); *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir.

_____

[9] While Lewis's evidence of increased scrutiny and workplace animosity "can contribute to a finding that an adverse employment action has taken place," these actions themselves do not constitute adverse employment actions for purposes of the statutes. *Uddin v. City of New York,* 427 F. Supp. 2d 414, 429-30 (S.D.N.Y. 2006) ("[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation.") (citation and internal quotation marks omitted).

1996) (finding that employee who alleged he was transferred from an "'elite' [unit] which provided prestige and opportunity for advancement, to a less prestigious unit with little opportunity for professional growth" made out *prima facie* case and "question of whether de la Cruz has been harmed by the transfer would be a question of fact for trial"); *Rodriguez v. Bd. of Ed. of Eastchester Union Free Sch. Dist.*, 620 F.2d 362, 366 (2d Cir. 1980) (finding plaintiff sufficiently alleged that she suffered an adverse employment action when transferred from junior high school to elementary school which "render[ed] utterly useless her twenty years of experience"). Accordingly, summary judgment on plaintiff's 2003 disparate treatment claim is denied.

### ii. Rescission of Reclassification to Station Agent

With regard to Lewis's claim of discrimination arising out of the Transit Authority's April 29, 2005 rescission of her station agent reclassification, the Transit Authority does not dispute that plaintiff made out a *prima facie* case of discrimination, but contends that its termination of her station agent position was not motivated by discriminatory animus. Rather, the Transit Authority contends that Lewis was terminated because she refused to comply with the updated headwear (logo-on-khimar) policy –a policy that, according to the Transit Authority, Lewis, herself, proposed. The Transit Authority contends that it "accepted Ms. Lewis's suggestion [to put a "logo on top" of her khimar and her] refusal to accept the headwear accommodation she herself had proposed (wearing the 'logo on top' of her khimar) is grounds for dismiss of her claim." (Def.'s Br. at 13.) In support of its assertion that Lewis had proposed this policy, the Transit Authority cites to plaintiff's Amended Complaint, which alleges that at a February 12, 2003 meeting to discuss her role as a bus driver: "[Lewis] suggested that she make the 'khimar' with the same material and color as the [Transit Authority] uniform with the logo on top." (Def.'s Br. at 13, citing Amd. Compl. ¶ 37.) In effect, the Transit Authority contends that

Lewis was *really* terminated for insubordination, when she refused to comply with the station agent uniform requirements.

Under the *McDonnell Douglas* framework, once an employer proffers a non-discriminatory reason for its action, the burden shifts back to the employee to demonstrate that the proffered reason is mere pretext. *Hicks*, 509 U.S. at 510-11. Pretext may be established "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. Here, plaintiff does both.

First, plaintiff has demonstrated that there is a question of fact whether a discriminatory reason more likely motivated the Transit Authority. Almost immediately after Lewis was slated for reclassification to station agent on October 27, 2004, the Transit Authority promulgated an updated Bulletin dated November 15, 2004, directing station agents to comply with its khimar policy. While at reclassification training, the Transit Authority directed supervisors to strictly enforce that policy with respect to Lewis. (Pl.'s 56.1 Stmt. ¶ 82.) On the first day she began working, the Transit Authority cited her non-compliance with that policy to terminate her. This sequence of events creates a genuine question whether the Transit Authority's actions were designed to terminate Lewis on account of her religious practices, rather than permit her to reenter passenger service and interact with customers in her khimar.

Second, plaintiff meets her burden of presenting evidence from which a rational trier of fact could conclude that the Transit Authority's proffered explanation is unworthy of belief. *See e.g.*, *Fillie-Faboe v. Vocational Educ. & Extension Bd.*, 95-CV-4887NGGWDW, 2001 WL 533739, at *5 (E.D.N.Y. May 11, 2001) (finding teacher met her burden of presenting sufficient evidence that the employer's proffered reason was "unworthy of belief" under the third prong of

*McDonnell Douglas* by offering evidence of her performance contrary to her employer's narrative and demonstrating disparate treatment between her and other similarly situated faculty). Lewis explained that: "that statement in my Complaint refers to my suggestion at the February 12, 2003 meeting that I wear a logo affixed to my khimar *near my shoulder*. There was no discussion of logo patches on top of my forehead during the February 2003 meeting, and the notion of affixing a [Transit Authority] logo patch to my forehead [was not discussed] … until late 2004…." (Lewis Decl. ¶ 55.) Rather, Lewis contends that the Transit Authority knew that Lewis, as a devout Muslim, pressed her forehead to the ground when she prayed and that placing a patch over her forehead would interfere with those prayers. (Pl.'s 56.1 Stmt. ¶ 77.) The Transit Authority imposed an updated headwear policy specifically targeting khimar-wearers and directing them to place a logo on their foreheads, but never consulted with Lewis, her attorneys, or her union about the design of that policy and whether it would cure her and other similarly situated Muslim women's religious objections to its policies. (Pl.'s 56.1 Stmt. ¶ 89-91).[10] There is thus a genuine question of fact whether the Transit Authority's contention that it was not motivated by discriminatory animus is unworthy of belief. Accordingly, summary judgment on these grounds is denied.

---

[10] In support of its argument, the Transit Authority cites *Valdes v. New Jersey*, a case in which a Muslim officer employed by the New Jersey Department of Corrections asserted that his religion prohibited him from being clean shaven, as required by Department's facial hair policy. CIV. 05-3510 GEB, 2007 WL 1657354 (D.N.J. June 6, 2007), *aff'd*, 313 F. App'x 499 (3d Cir. 2008). The case is inapposite because Mr. Valdes did not bring a Title VII disparate treatment claim. Moreover, in *Valdes*, the Department agreed to allow Mr. Valdes to keep his beard no longer than one-eighth of an inch, as an accommodation of his religious beliefs, and "plaintiff signed a written acknowledgment and agreement regarding the one-eighth inch maximum facial hair growth." *Id*. at *1. The New Jersey District Court observed that plaintiff had agreed to the accommodation in writing, and thus knew that when he ignored the "parameters of this agreement, … he put himself at significant risk that he would be dismissed." *Id*. at *9. Here, there was no agreement regarding an accommodation because the Transit Authority did not consult with Lewis before imposing the logo-on-khimar policy.

### B.  *Title VII Religious Discrimination – Failure to Accommodate*

Title VII protects "all aspects of religious observance and practice, as well as belief" and obligates employers to make reasonable accommodations for the religious practices of their employees.  42 U.S.C. § 2000e(j).  The Second Circuit has explained that, "[i]n brief, it is 'an unlawful employment practice ... for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees.'" *Baker*, 445 F.3d at 546 (quoting *Trans World Airlines*, 432 U.S. at 74).

In order to make out a *prima facie* case of religious discrimination, a plaintiff must show that (1) she held a "*bona fide* religious belief conflicting with an employment requirement;" (2) she informed her employer of this belief; and (3) she was "disciplined for failure to comply with the conflicting employment requirement."  *Baker*, 445 F.3d at 546 (italics added).   "Once a *prima facie* case is established by the employee, the employer 'must offer [him or her] a reasonable accommodation, unless doing so would cause the employer to suffer an undue hardship.'" *Id.* (quoting *Cosme v. Henderson,* 287 F.3d 152, 158 (2d Cir. 2002) (alterations in original, italics added)).

#### i.  *Prima facie* Case

Here, the Transit Authority does not dispute that Lewis held a *bona fide* religious belief conflicting with the Transit Authority's headwear policy or that she informed the Transit Authority of this through her request for accommodation.  However, the Transit Authority asserts that plaintiff cannot establish that Lewis was disciplined for refusing to remove or cover her khimar.  Rather, the Transit Authority contends that transferring her to the bus depot was a "reasonable accommodation."  (Def.'s Br. at 20-22.)  Plaintiff responds that she was disciplined for refusing to compromise her religious beliefs on two occasions: first, in 2003, when she was

removed from "passenger service" and transferred to the bus depot, and second, in 2005, when she was not permitted to start her job as station agent after completing reclassification and instead sent back to the bus depot.

"The Second Circuit has never defined 'discipline' within the context of the three-pronged religious discrimination test." *Siddiqi v. N.Y. City Health & Hosp. Corp.*, 572 F. Supp. 2d 353, 370 (S.D.N.Y. 2008) (citations omitted). However, the third prong of a failure-to-accommodate claim "has been equated with the requirement of an adverse employment action" under the *McDonnell Douglas* framework. *Price v. Cushman & Wakefield, Inc.*, 808 F. Supp. 2d 670, 695 (S.D.N.Y. 2011); *see also Guy v. MTA New York City Transit*, 10 CV 1998 KAM LB, 2012 WL 4472112, at *6 (E.D.N.Y. Aug. 6, 2012) *R&R adopted*, 2012 WL 4472098 (E.D.N.Y. Sept. 26, 2012) (finding no adverse action where Sabbath observer used vacation days to avoid conflict with religious practices, was written up for missing work without further disciplinary action, and received inconvenient assignments).[11] An adverse employment action includes "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya*, 202 F.3d at 640. "To be

---

[11] *See also Bowles*, 2006 WL 1418602, at *9 (explaining that discipline for failure to comply encompasses any "adverse employment action—typically, discipline, demotion, transfer or termination—for refusing to comply with the conflicting employment requirement"); *Durant v. NYNEX*, 101 F. Supp. 2d 227, 233 (S.D.N.Y. 2000) ("Durant has not established a *prima facie* case of religious discrimination because she was never disciplined for her failure to work on the Sabbath. A plaintiff must show that she has suffered an adverse change in the conditions of her employment."); *O'Neill v. City of Bridgeport Police Dep't*, 719 F. Supp. 2d 219, 225 (D. Conn. 2010) (concluding that plaintiff, a Seventh Day Adventist who observed Sabbath on Saturdays did not suffer " an adverse employment action, at least for the purposes of a religious discrimination claim" when he was forced to work on some Saturdays and use his vacation time to take Saturdays off but observing that "had [plaintiff] just refused to show up on a Saturday and been terminated or disciplined for his disobedience, there is no question that he would have satisfied the adverse employment action prong of the *prima facie* case.").

'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id*. (internal quotation marks and citation omitted).

Here, as explained above, a reasonable jury could find that the transfer to the bus depot was an adverse employment action. Likewise, the rescission of Lewis's reclassification, which led to her termination could constitute an adverse action. Thus, there is sufficient evidence to establish plaintiff's *prima facie* case for summary judgment purposes.

ii. Reasonable Accommodation

The Transit Authority contends that involuntarily transferring Lewis to the bus depot constituted a reasonable accommodation of her religious practices calculated to eliminate the conflict between her religious practices and the Transit Authority's headwear requirement.

A reasonable accommodation is one that eliminates the conflict between the employee's religious practice and the employer's policy. *Cosme*, 287 F.3d at 159. "In formulating such an accommodation, both the employer and employee should remain flexible, with an eye toward achieving a mutually acceptable adjustment." *Id*. at 158. "[T]he employer need not offer the accommodation the employee prefers. Instead, when any reasonable accommodation is provided, the statutory inquiry ends." *Id.*

However, while an employee is not entitled to the "most beneficial accommodation," *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986), "an offer of accommodation may be *unreasonable* 'if it cause[s] [an employee] to suffer an inexplicable diminution in his employee status or benefits.... In other words, an accommodation might be unreasonable if it imposes a significant work-related burden on the employee without justification, such as the neutral operation of a seniority system.'" *Baker*, 445 F.3d at 548 (citing *Cosme*, 287 F.3d at 160)

(alterations and emphasis in original). The Second Circuit has emphasized that "'inexplicable,' 'significant,' and 'justification' are the operative words to be reckoned with in any analysis of reasonableness." *Id*.

Here, as this Court observed in a related case involving this same Transit Authority policy and this same plaintiff:

> The determination of "[w]hether or not something constitutes a reasonable accommodation is necessarily fact-specific." *Wernick v. Fed. Reserve Bank,* 91 F.3d 379, 385 (2d Cir. 1996). It typically requires a cost-benefit analysis: an evaluation of "the desirability of a particular accommodation according to the consequences that the accommodation will produce." *Borkowski v. Valley Cent. School Dist.,* 63 F.3d 131, 138 (2d Cir. 1995). "[D]eterminations on this issue must be made on a case-by-case basis, *Wernick,* 91 F.3d at 385, and "[o]rdinarily, questions of reasonableness are best left to the fact finder." *Baker*, 445 F.3d at 548 (quoting *EEOC v. Universal Mfg. Corp*., 914 F.2d 71, 73 (5th Cir. 1990)).

> Defendants have not persuaded this Court that this is the extraordinary case in which the reasonableness of defendants' … accommodations can be determined as a matter of law…. [Lewis] has adduced proof which, if credited, might establish a diminution of status and benefits. For example, … the [Transit Authority's] policies rendered [Lewis] unable to use [her] seniority to pick the routes and hours [she] wanted, including routes that guaranteed overtime. … Moreover, [Lewis] testified that [she was] harassed because [her] position—created, in part, by "taking away from existing shifters' assignments pieces of planned overtime," *id.*—deprived other, more senior shifters of overtime. Lewis Dec. at 132 (harassed by co-workers commenting that she "was taking overtime away from them") ….

> In addition to this evidence of a diminution of benefits, there [is] a genuine issue of fact regarding a diminution in status. Although shifting work might generally be viewed as desirable, as evidenced by the seniority of the shifters, [Lewis] testified that [she was] required to perform menial, janitorial work, such [as] washing windows (Lewis Dec. at ¶ 28). In addition, … the bus depots were "dangerous" and "full of noxious fumes" (Alkebulan Dec. at ¶ 57; Lewis Dec. at ¶ 33; Small Dec. at ¶ 28) … [and Lewis] suffered serious injury to her head and back as a result of dangerous conditions in the workplace (Lewis Dec. at ¶ 33).

*United States v. New York City Transit Auth.*, 2010 WL 3855191, at *17-19.

To the extent the Transit Authority contends that its 2004 policy change – that would have permitted Lewis not to cover her khimar with a baseball hat as long as she affixed a logo to

her forehead – was an accommodation, Lewis testified that this policy did not eliminate the conflict with her religious beliefs because affixing a logo to her forehead would have interfered with her prayers. Accordingly, there is a genuine issue of material fact concerning whether the reassignment to the bus depot and reclassification diminished Lewis's status or otherwise imposed a significant work-related burden on Lewis without justification. *See Baker*, 445 F.3d at 548.

### iii. Undue Hardship

The Transit Authority argues that, even if Lewis makes out a *prima facie* case and transferring her to the bus depot was not a reasonable accommodation, "as a matter of law, it was justified in not exempting Ms. Lewis from the logo-on-top-of-the-khimar uniform policy for station agents, that is, in believing that such an exemption would create an undue hardship through undercutting the [Transit Authority's] right as an employer to present its chosen image to the public through a uniformly applied appearance standard…." (Def.'s Br. at 13.) The Transit Authority forecasts a parade of horribles that would have followed if Lewis and other Muslim women had been permitted to affix its logo to their shoulders instead of their foreheads: such an exception would, "in our religiously diverse country [be] 'courting anarchy,' or at least run the danger of violating the Constitution's Establishment Clause and Title VII itself." (*Id.*)[12]

---

[12] The Transit Authority contends that "there is ample precedent for supporting the concept that, in the area of religion-based distinctions, government should not … favor (some) religious people over all others, pious or secular, or one religious belief over another…." (Def.'s Br. at 14.) The Transit Authority appears to be raising some manner of Establishment Clause argument. While it is true that the Transit Authority is generally not permitted to "favor some religious people over all others," as explained above, the Transit Authority *is* affirmatively obligated to offer its employees religion-based reasonable accommodations absent undue hardship. *Cosme*, 287 F.3d at 158.

An accommodation causes an undue hardship when it results in "more than a *de minimis* cost to the employer." *Baker*, 445 F.3d at 548 (internal quotation marks and citation omitted). The Transit Authority contends that "exempting" Lewis from its headwear policy would have caused it to lose control of its public image – an undue hardship. But the Transit Authority has not adduced any evidence supporting its contention that permitting Lewis to wear her khimar without a cap on top of it and without affixing a logo to her forehead would have been anything more than a *de minimis* imposition on the Transit Authority's headwear policy. At the February 12, 2003 meeting, Lewis proposed slightly altering the Transit Authority headwear by affixing the logo to her shoulder instead of her forehead. The Transit Authority does not dispute that it permitted other bus drivers to deviate from its headgear policy without compromising its public image. For example, after the September 11, 2001 terrorist attacks, bus drivers were permitted to wear FDNY hats in solidarity with the fire department. Likewise, a survey conducted by the DOJ found over 300 violations of the headwear policy in just 11 hours in 2005.[13] This Court cannot conclude, as a matter of law, that permitting Lewis to wear her khimar without a Transit

---

[13] In its reply, the Transit Authority contends that the DOJ study was flawed for a variety of reasons. However the study, in addition to other evidence of the Transit Authority's lax enforcement of its uniform policy, is sufficient to create a question of fact. Just how much weight to place on it is a question for the factfinder to decide. *See Lion Oil Trading & Transp., Inc. v. Statoil Mktg. & Trading (US) Inc.*, 08 CIV. 11315 WHP, 2011 WL 855876, at *3 (S.D.N.Y. Feb. 28, 2011) (concluding that "flaws [in a study] go to the weight a jury should accord the survey at trial, rather than to its admissibility"). Because the Transit Authority's assault on the DOJ study does not carry the day, plaintiff's pending motion to strike the Transit Authority's reply with respect to this study or for leave to file a surreply is denied as moot and also denied because the Transit Authority raises no "new arguments" in its reply. *See Gayle v. Harry's Nurses Registry, Inc.*, 07-CV-4672 NGG MDG, 2012 WL 4174401, at *4 (E.D.N.Y. Sept. 18, 2012) ("Although 'new issues may not be raised for the first time in reply,' … 'reply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party') (internal citations omitted). To the extent the Transit Authority improperly introduces any new arguments or new evidence on reply, this Court does not consider those arguments or that evidence, and even if it did, it would not alter this analysis.

Authority cap on top or a logo on her forehead would have had any deleterious effects on the Transit Authority's public image.[14]

### C. Disparate Impact

Disparate impact discrimination, which is also barred by Title VII and NYSHRL, occurs when an employer uses facially neutral policies or practices that a have a disproportionately adverse effect on protected groups. *Ricci*, 557 U.S. at 577-78; *Gonzalez v. City of New York*, 135 F. Supp. 2d 385, 399 (E.D.N.Y. 2001) (analyzing disparate impact claims under NYSHRL). "Disparate-impact claims do not require a showing of discriminatory intent." *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011). Rather, "a plaintiff establishes a *prima facie* violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Ricci*, 557 U.S. at 578 (citing 42 U.S.C. § 2000e–2(k)(1)(A)(i)). An employer can rebut a *prima facie* case "by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" *Id*. The plaintiff, in turn, can rebut that showing by "showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Id*. (citing §§ 2000e–2(k)(1)(A)(ii) and (C)).

The Transit Authority disputes that plaintiff has put forward sufficient "probative statistical evidence" to support its disparate impact theory. (Def.'s Br. at 15.) "The basis for a successful disparate impact claim involves a comparison between two groups—those affected

---

[14] Moreover, "what constitutes an undue hardship may be somewhat different for a private employer than" for a public one. *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 136 (1st Cir. 2004). "The [Transit Authority], which runs all of New York City's subways and most City buses, simply does not face the 'highly competitive business environment' that justified upholding the grooming requirements in cases [involving private businesses]." *United States v. New York City Transit Auth.*, 2010 WL 3855191, at *22.

and those unaffected by the facially neutral policy." *Tsombanidis v. W. Haven Fire Dep't*, 352

F.3d 565, 575 (2d Cir. 2003). To establish a *prima facie* disparate impact claim, plaintiffs must

show a statistically significant disparity in the treatment of two groups. *Id*. at 756; *Ricci*, 557

U.S. at 559 (explaining that "a *prima facie* case of disparate-impact liability [is] essentially[] a

threshold showing of a significant statistical disparity and nothing more."). This is frequently

proved through statistics. *Tsombanidis*, 352 F.3d at 756. However, statistical evidence is not

required to show disparity in outcome between groups:

> [The case law does not] support the proposition that disparate impact plaintiffs
> *must* substantiate their claim with statistical or medical evidence; n[or] is there
> any language in Title VII … to that effect. At most, then, [case law] hold[s] that
> in *some* types of disparate impact cases, such as in cases where the impact of the
> prohibited conduct is diffuse, widespread or otherwise difficult to detect,
> statistical evidence may be the only available or best means of establishing the
> alleged impact.

*James v. Nat'l R.R. Passenger Corp.*, 1:02-CV-03915-RJH, 2005 WL 6182322, at *4 (S.D.N.Y.

Mar. 30, 2005) (emphasis in original). Hence, statistical evidence is not *required*.[15]

---

[15] *See also Tsombanidis*, 352 F.3d at 576 ("[T]here may be cases where statistics are not
necessary," provided that there is "some analytical mechanism to determine disproportionate
impact.") (internal citations omitted); *Garcia v. Woman's Hospital of Texas*, 97 F.3d 810, 813
(5th Cir. 1996) (holding that statistical evidence was not required in a disparate impact case of
pregnancy discrimination, and stating, "[i]f all or substantially all pregnant women would be
advised by their obstetrician not to lift 150 pounds, then they would certainly be
disproportionately affected by this supposedly mandatory job requirement for [employees] at the
Hospital. Statistical evidence would be unnecessary if Garcia could establish this point."); *Lynch
v. Freeman*, 817 F.2d 380, 387-88 (6th Cir. 1987) ("The district court … correctly ruled that the
plaintiff was not required to prove her case by statistics. While Title VII plaintiffs may be able
to prove some disparate impact cases by statistics, that is not the only avenue available."); *Craig
v. Ala. State Univ.,* 804 F.2d 682, 687 n.7 (11th Cir. 1986) (Statistical proof not required if
employee offers evidence "to show that a facially neutral policy must in the ordinary course have
a disparate impact on a protected group of which an individual plaintiff is a member.") (quoting
*Mitchell v. Bd. of Trustees of Pickens Cnty.*, 599 F.2d 582, 585 n. 7 (4th Cir. 1979); *Dothard v.
Rawlinson*, 433 U.S. 321, 331 (1977) (observing that plaintiffs "are not required to exhaust every
possible source of evidence, if the evidence actually presented on its face conspicuously
demonstrates a job requirement's grossly discriminatory impact"); *Bodnar v. Motorola, Inc.*, 967

Here, the evidence in the record establishes that at least four Muslim women and a Sikh man were transferred out of passenger service for violating the Transit Authority's headwear policy while *zero* Transit Authority employees who violated the headwear policy for secular reasons were transferred, although there were at least 48 such violations in 2003 and 2004. (Schoolman Ex. H, Decl. of David Hyland at ¶ 12; Ex. T, Bus Operator Out of Uniform 2003-2004 EIS Query.)  This evidence, "on its face[,] conspicuously demonstrates [the headwear policy's] grossly discriminatory impact." *Dothard*, 433 U.S. at 331.  As in *James*, statistical analysis is unnecessary because a reasonable juror can conclude that any similarly situated employee who wears a khimar "would be subject to the same 'impact' as was plaintiff … [and while employees outside of plaintiff's protected class] … were certainly subject to these same [rules], … plaintiff and similarly situated [Muslim] women were affected to a greater degree than were [non-Muslims]." *James*, 2005 WL 6182322 at *5.  Indeed, the Transit Authority concedes that Lewis and other similarly situated Muslim women and Sikh men suffered a disparate impact as a result of the Transit Authority's facially neutral headwear policies; Lewis and similarly situated employees with religious objections to the headwear policy were "re-assigned … to non-passenger service bus operator duties … [because] the policy only applies … in passenger service," while employees caught wearing unauthorized headwear without religious objections were merely "disciplined."  (Def.'s 56.1 Stmt. ¶¶ 10-11, 13.)  Accordingly, a reasonable juror could conclude that the Transit Authority's facially neutral policies or practices had a disproportionately adverse effect on Muslim women and Sikh men.

---

F.2d 584 (9th Cir. 1992) (observing, in dicta, that "statistical evidence is not required as a matter of law in … Title VII cases.").

### D. Retaliation

Title VII also includes an anti-retaliation provision which makes it unlawful "for an employer to discriminate against any ... employee[ ] or applicant[ ] ... because [that individual] opposed any practice" made unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3(a). This anti-retaliation provision is intended to further the goals of the anti-discrimination provision "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006).

Courts analyze Title VII and NYSHRL retaliation claims under the three-step *McDonnell Douglas* burden-shifting framework. *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) ("Federal and state law retaliation claims are reviewed under the burden-shifting approach of *McDonnell Douglas*."). A plaintiff must establish a *prima facie* case of retaliation by showing that (1) she engaged in a protected activity; (2) her employer was aware of that activity; (3) the employer took a materially adverse action; and (4) a causal connection existed between the adverse action and the protected activity. *Id*. at 844. The plaintiff's burden in this regard is "*de minimis,*" and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005) (internal quotation marks omitted). If the plaintiff meets this initial burden, "a presumption of retaliation arises" and the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action. *Id*. If the employer does so, the burden shifts back, the presumption dissipates and it becomes the plaintiff's burden

to demonstrate that "but for" the protected activity, she would not have suffered the adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ⸺ U.S. ⸺, 133 S.Ct. 2517, 2533 (2013).

The Supreme Court recently clarified that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 133 S.Ct. at 2533. In light of *Nassar*, a plaintiff can no longer defeat summary judgment by simply showing that retaliation was a motivating factor in the employer's adverse employment action. "However, the but-for causation standard does not alter the plaintiff's ability to demonstrate causation at the *prima facie* stage on summary judgment or at trial indirectly through temporal proximity," and it "does not require proof that retaliation was the *only* cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan*, 737 F.3d at 845-46 (emphasis added).

Here, the Transit Authority contends that there can be no inference of retaliatory intent because Lewis did not engage in any protected activity *before* she was transferred to the bus depot in 2003 (Def.'s Br. at 23) and because the rescission of her reclassification in 2005 is too temporally remote from her (1) April 3, 2003 grievance to her union representative, (2) December 4, 2003 EEOC charge of discrimination, or (3) June 4, 2004 lawsuit.

Contrary to the Transit Authority's argument, Lewis first engaged in a protected activity on February 12, 2003. A "protected activity" is any activity which is taken to "protest or oppose" unlawful employment practices under Title VII. *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (construing 42 U.S.C. § 2000e-3(a)). "When an employee communicates to her employer a belief that the employer has engaged in a form of employment

discrimination, that communication virtually always constitutes the employee's opposition to the activity." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009). Protected activities include filing formal complaints, as well as making "informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges," *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990), so long as the employee has "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001) (citations omitted). On February 12, 2003, Lewis attended a meeting with Superintendent Dicciardello, union representative Carter, and Vice Chair Carlos Clark, where she explained that she would not remove her khimar or wear a Transit Authority hat over it "because doing so would violate my religious beliefs," and asked why, "after wearing my khimar for 13 years," she could not continue doing so while driving buses in passenger service. (Decl. P20.) Both protesting a discriminatory employment practice and requesting an accommodation constitute protected activities. *See, e.g.*, *Jenkins v. New York City Transit Auth.*, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009) (Pentecostal bus driver's refusal to wear pants because of sincere religious beliefs and request for an accommodation [permission to wear a skirt instead] were protected activities); *Williams v. Wal-Mart Associates Inc.*, 2:12-CV-03821-AKK, 2013 WL 979103, at *3 (N.D. Ala. Mar. 8, 2013) ("[R]equesting a religious accommodation and refusing to work due to First Amendment religious exercise is 'protected activity.'"). Accordingly, Lewis's statements at the February 12, 2003 meeting constitute a "protected activity" in the context of her Title VII retaliation claim. Lewis's other alleged protected activities – speaking to the media and filing her union grievance, EEOC charge, and

lawsuit – may also be considered as protected activities for her retaliation claim.  (Pl.'s Br. at

22.)  The Transit Authority does not dispute that it was aware that Lewis engaged in these

activities. [16]

Immediately after engaging in a protected activity, also on February 12, 2003, Lewis was

removed for passenger service and transferred to the bus depot.  That transfer constitutes a

"materially adverse" action.  A "materially adverse" action in the context of Title VII's anti-

retaliation provisions is broader than an adverse employment action in the context of Title VII's

anti-discrimination provisions.  *See Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010)

---

[16] Lewis contends that she first engaged in protected activity on February 11, 2003, when she was reprimanded for refusing to remove her khimar.  Lewis testified that when Dispatcher Herman reprimand her for failing to comply with the Transit Authority's uniform policy, he was apologetic and she told him: "Don't feel bad, you are doing your job."  (Dep. 128:5-15.) Dispatcher Herman testified:

> Q: Did the operator explain why she refused to put the [Transit Authority] headwear on?
>
> A: No, she did not.
>
> Q:  Did you ask her why she refused to put the [Transit Authority] headwear on?
>
> A: No, I didn't. … I told her that Superintendent Middleton and Dicciardello had sent me to the location to see if she was wearing the [Transit Authority] logo cap, and that's why I was there, And I asked her to put it on and she said, "I will not."

Herman Dep. 52:6-20.  "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment *due to his membership in a protected class* and that he is not complaining merely of unfair treatment generally." *Aspilaire v. Wyeth Pharms., Inc.,* 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) (emphasis added) ("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity."); *see also Woods v. N.M.C. Labs.*, 93-CV-2908 (ERK), 1997 WL 1038873, at *2 (E.D.N.Y. July 14, 1997) *aff'd*, 162 F.3d 1149 (2d Cir. 1998) (concluding that plaintiff who did not complain that unfair treatment was based on race had not engaged in a Title VII-protected activity).  While Lewis did indeed refuse to comply with the Transit Authority's headgear policy, she did not expressly explain to Dispatcher Herman that this refusal was made because the headgear requirement conflicted with her religious beliefs.  Accordingly, she did not engage in a protected activity on February 11, 2003.

(explaining that "Title VII's anti-discrimination and anti-retaliation provisions 'are not coterminous'" and the "anti-retaliation protection is broader" and extends beyond "actions that affect the terms and conditions of employment") (citations omitted).  In the context of Title VII's anti-retaliation provisions, a materially adverse action is one that is "harmful to the point that [it] might well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations omitted).

In *White*, the Supreme Court has explained that whether a particular reassignment of job duties "is materially adverse depends upon the circumstances of the particular case," but where there was evidence that the reassigned duties were "by all accounts more arduous and dirtier," less prestigious, and "objectively considered" worse, "a jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee." *Id*. at 71.  As discussed above, there is ample evidence from which a reasonable juror could conclude that Lewis was subject to an adverse employment action when transferred to the bus depot in 2003.  Moreover, a reasonable juror could conclude that she was subject to an adverse employment action on April 29, 2005, when she was terminated from her reclassified station agent position for renewing her protests to the Transit Authority's headgear policy and refusing to affix a logo to her forehead on account of her religious beliefs.  (Pl.'s Br. at 22-23.)

Contrary to the Transit Authority's contention, Lewis has sufficiently demonstrated a causal connection between her protected activities and the Transit Authority's adverse employment actions.  "The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted).  Because there is no "bright line to define the outer limits beyond which a

temporal relationship is too attenuated to establish a causal relationship between the [protected activity] and an allegedly retaliatory action," courts must "exercise ... judgment about the permissible inferences that can be drawn from temporal proximity" within the context of each individual case. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Here, Lewis was transferred to the bus depot the very day that she complained that the Transit Authority's headgear policy violated her religious beliefs. Such a close temporal proximately clearly raises an inference of retaliatory intent. That she experienced more adversity and hostility over subsequent years only strengthens her argument. Because plaintiff has made out a *prima facie* case of retaliation, the burden shifts to the Transit Authority to proffer a non-retaliatory reason for transferring Lewis.

The Transit Authority argues, in a footnote, that it reassigned Lewis to the bus depot for "legitimate non-retaliatory reasons," namely "to provide a religious accommodation … and in so doing avoid disciplining her as the [Transit Authority] normally would do … for secular non-compliance with [the headgear] policy." (Def.'s Br. 23 n.70.) "[A]fter the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the *prima facie* case drops from the picture … [and t]he plaintiff must then [demonstrate that the] non-retaliatory reason is a mere pretext for retaliation." *Zann Kwan*, 737 F.3d at 845. A plaintiff may do so by "demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action … [from which], a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id*. Here, Lewis does just that by pointing out that secular bus drivers who violated the Transit Authority's headgear policy – such as drivers who wore FDNY hats in solidarity with the fire department after 9/11– were not

disciplined. "From such discrepancies a reasonable juror could infer that the explanations given by [the Transit Authority] were pretextual." *Id*. at 847 (citation omitted); *see also id*. at 846 n.5 ("The determination of whether retaliation was a 'but—for' cause, rather than just a motivating factor, is particularly poorly suited to disposition by summary judgment, because it requires weighing of the disputed facts, rather than a determination that there is no genuine dispute as to any material fact.") For that reason, it is the jury that "should eventually determine whether the plaintiff has proved by a preponderance of the evidence … that she would not have been terminated if she had not complained about discrimination." *Id*.

## V.     *NYCHRL Claims*

Unlike plaintiff's state law claims under the NYSHRL, claims under the NYCHRL are not analyzed under the same framework that applies to her federal claims. Title 8 of the NYCHRL states that it "shall be construed liberally for the accomplishment of the broad and remedial purposes" of that law. Claims under the NYCHRL must receive an "independent liberal construction" that is not "co-extensive" with federal counterparts. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citing *Williams v. N.Y. City Hous. Auth.*, 61 A.D.3d 62, 66, 872 N.Y.S.2d 27, 31 (1st Dept 2009)); *Bennett v. Health Mgmt. Sys., Inc.,* 92 A.D.3d 29, 936 N.Y.S.2d 112, 116 (1st Dep't 2011) ("[A]fter the passage of the New York City Local Civil Rights Restoration Act (Local Law No. 85 [2005] of City of NY) … , it is beyond dispute that the [NYC]HRL now 'explicitly requires an independent liberal construction analysis *in all circumstances*, … targeted to understanding and fulfilling … the [NYC]HRL's 'uniquely broad and remedial' purposes, which go beyond those of counterpart state or federal civil rights laws") (citations omitted, emphasis in original).

Here, because the Court has already determined that plaintiff's claims survive summary judgment under Title VII and the NYSHRL, it assumes that those claims also satisfy the less burdensome NYCHRL standard.  *Zann Kwan*, 737 F.3d at 843 n.3 ("[T]o the extent that the defendant has failed to show it is entitled to summary judgment under *McDonnell Douglas*[ on its Title VII and NYSHRL claims], it would not be entitled to summary judgment under the more expansive standard of the NYCHRL."); *Adams v. City of New York*, 837 F. Supp. 2d 108, 127 (E.D.N.Y. 2011) (finding no need to separately analyze NYCHRL claims, other than those "claims that failed to pass under the Title VII and NYSHRL standards" because claims that satisfied federal and state standards will necessarily satisfy the less exacting NYCHRL standards).

The Transit Authority contends that Plaintiff's NYCHRL claims fail because, "by the express terms of N.Y. Pub. Auth. Law § 1266(8), the City Administrative Code[, including NYCHRL,] … *jurisdictionally* would not apply to the [Transit Authority]."  (Def.'s Br. at 14 n.47.)  New York Public Authorities Law § 1266(8) states that "no municipality ... shall have jurisdiction over any facilities of the [Metropolitan Transportation Authority]," including the "New York [C]ity [T]ransit [A]uthority."  When the Transit Authority raised this same exact argument in *Simmons*, the Second Circuit observed that "[n]o New York court has accepted the [Transit Authority's] position."  *Simmons*, 340 F. App'x at 27 (collecting cases).  Rather, "courts have noted that § 1266 'only exempt[s] the [Transit Authority] from the reach of local laws which 'interfere with the accomplishment' of the [Transit Authority]'s purpose."  *Id*. (citations omitted).  However, because complying with local civil rights laws does not interfere with the Transit Authority's purpose, "those courts also reasonably concluded that the TA is not exempt from the NYCHRL."  *Id*.  (citations omitted); *see also Muhammad v. New York City Transit*

*Auth.*, 450 F. Supp. 2d 198, 208 (E.D.N.Y. 2006).  Thus, summary judgment is denied on plaintiff's NYCHRL claims.

## VI.    *First Amendment Free Exercise and Free Speech Retaliation*

The First Amendment of the United States Constitution, which applies to the states and their subdivisions through the Fourteenth Amendment, *see Walz v. Tax Comm'n of City of N.Y.,* 397 U.S. 664, 702 (1970), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech…." U.S. Const. amend. I.  "A violation of one's rights under the Free Exercise [or Free Speech] Clauses of the First Amendment may, in some circumstances, be actionable under federal civil rights statutes."  *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir. 1995); *City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994).  Section 1983 creates a private cause of action for deprivations, under color of state law, of a person's "rights, privileges, or immunities secured by the Constitution and laws" of the United States, 42 U.S.C. § 1983, "including the First Amendment right to the free exercise of religion," *LeBlanc-Sternberg*, 67 F.3d at 426 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520 (1993)), and the First Amendment right to Free Speech, *see Gilleo*, 512 U.S. at 45 n.1.  Where a municipality's policies or practices deprive individuals of their federal rights, the municipality may be held liable.  *See generally Monell v. New York City Department of Social Services*, 436 U.S. 658, 690–94 (1978).  Transit Authority, as a subdivision of New York, is barred from infringing its employees' First Amendment rights.  *See*, *e.g.*, *Kalsi v. New York City Transit Auth.*, 62 F. Supp. 2d 745, 761 (E.D.N.Y. 1998) *aff'd*, 189 F.3d 461 (2d Cir. 1999) (recognizing Free Exercise claim against Transit Authority, but finding plaintiff failed to offer any proof in support of allegation of intentional discrimination).

## A. *Free Exercise*

Plaintiff argues that the Transit Authority's headwear policy violated the Free Exercise Clause of the First Amendment by impermissibly regulating religious practices in a non-neutral fashion and substantially burdening Lewis's religious beliefs.

"The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990). "[T]he protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi Babalu Aye*, 508 U.S. at 532 (emphasis added). "[I]f the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral and it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Id*. at 533 (internal citation omitted).

However, the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith,* 494 U.S. at 879 (internal quotation marks omitted). "Where the government seeks to enforce a law that is neutral and of general applicability, … it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570, 574 (2d Cir. 2002); *Seabrook v. City of New York*, 210 F.3d 355 (2d Cir. 2000) (citing *Smith*, applying rational basis review to Free Exercise challenge to pants-only policy by Pentecostal corrections officers); *Kalsi v. New York City Transit Authority,* 62 F. Supp. 2d 745, 761 (E.D.N.Y. 1998) (citing *Smith*, applying rational basis review to Free Exercise challenge to hard-hat requirement by Sikh employee).

"In determining if the object of a law is a neutral one under the Free Exercise Clause, [courts consider] … both direct and circumstantial evidence." *Lukumi Babalu Aye*, 508 U.S. at 540.  The Court "must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face.  A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Id*. at 534.  However, "[f]acial neutrality is not determinative," and "[a]part because the text, the effect of a law in its real operation is strong evidence of its object." *Id*. at 535.  Other relevant evidence includes "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id*. at 540.

Here, citing *Smith*, the Transit Authority contends that its headgear policy was a neutral policy that only incidentally affected Lewis's religious practices, and thus not a violation of the Free Exercise Clause.  Plaintiff, citing *Lukumi Babalu Aye*, responds that plaintiff's Free Exercise claim is directed at the Transit Authority's non-neutral Bulletins which expressly target religious head-coverings.  Plaintiff contends that the object of those policies was the suppression of the practice of wearing khimars by its employees and those policies were thus invalid because they were neither justified by a compelling interest nor narrowly tailored to advance that interest.

Although the parties to do not address Lewis's status as a public employee, the fact that Lewis was employed by the City adds an additional wrinkle to this Court's analysis.  When the government acts as an employer, it has more leeway in regulating its employees and curtailing their rights than it does when it acts as a sovereign. *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598-600 (2008) ("[T]here is a crucial difference, with respect to constitutional analysis, between the government exercising 'the power to regulate or license, as lawmaker,' and the

government acting 'as proprietor, to manage [its] internal operation.'") (citations omitted). The Supreme Court explained that "although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context" and, "in striking the appropriate balance, [courts] consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer." *Id*. at 600. This is because "'[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.'" *Id*. (citing *Waters v. Churchill*, 511 U.S. 661, 675 (1994) (plurality opinion)).

Neither the Supreme Court nor the Second Circuit has had occasion to resolve whether the *Lukumi Babalu Aye* strict scrutiny standard applies in the public employee context. However, courts outside this jurisdiction have held that an intermediate level of scrutiny applies, instead of the strict scrutiny set forth in *Lukumi Babalu Aye*, when a Free Exercise challenge is directed at a non-neutral rule imposed by the government as an employer, as opposed to a rule applicable to the general public. [17] For example, in *Fraternal Order of Police Newark Lodge No.*

_____

[17] *See e.g.*, *Finnie v. Lee Cnty., Miss.*, 907 F. Supp. 2d 750, 767 (N.D. Miss. 2012) (in challenge by Pentecostal women to pants-only policy for juvenile detention officers, observing that "numerous courts have retreated from the typical strict scrutiny review to adopt some other less rigorous analytical framework in public employment free exercise cases"); *Nichol v. ARIN Intermediate Unit 28*, 268 F. Supp. 2d 536, 550-51 (W.D. Pa. 2003) (in challenge to no-religious-garb policy by teacher who wore a cross, observing that "'[h]eightened' or 'intermediate' level scrutiny generally applies in the public sector") (citing *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 166 n.27 (3d Cir. 2002) (applying intermediate scrutiny because "First Amendment rights are limited in the public employment context by a government's need to function efficiently")); *Brown v. Polk County, Iowa*, 61 F.3d 650 (8th Cir. 1995) (en banc) (("[*Pickering*] dealt with free speech rather than the free exercise of religion, but because the analogy is such a close one, and because we see no essential relevant differences between those rights, we shall endeavor to apply the principles of *Pickering* to the case at hand.")

49

*12 v. City of Newark*, the Newark police department disciplined and removed two Sunni Muslim police officers for refusing, for religious reasons, to comply with the department's no-beards policy that expressly provided medical, but not religious, exemptions from the policy. 170 F.3d 359 (3d Cir. 1999) (Alito, J.). Then-Circuit Court Judge Alito, explained that "[w]hile *Smith* and *Lukumi* speak in terms of strict scrutiny when discussing the requirements for making distinctions between religious and secular exemptions, [the Court] assume[s] that an intermediate level of scrutiny applies since this case arose in the public employment context and since the [Police] Department's actions cannot survive even that level of scrutiny." *Id.* at 367 n.7. This Court need not decide what level of scrutiny applies because there is ample evidence in the record that the Transit Authority's policies cannot survive even intermediate scrutiny.

Here, the challenged policies were not facially neutral. The Transit Authority concedes that, when Lewis was transferred to the bus depot, the policy was that employees with religious objections to its headgear requirements were to be transferred to the bus depot. After transferring Lewis, the Transit Authority published a series of Bulletins expressly setting out its policy with regard to khimars. The November 17, 2003 Bulletin expressly required Muslim female bus drivers to cover their khimars with a "depot logo cap." (Pl.'s 56.1 Stmt. Ex. 12.) The

---

(citing *Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U.S. 563, 568 (1968) (holding, in free speech context, when a public employee's First Amendment rights are abridged by her employer, courts must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.")); *Draper v. Logan Cnty. Pub. Library*, 403 F. Supp. 2d 608, 623 (W.D. Ky. 2005) (in challenge to no-religious-jewelry policy by librarian who wore a cross, observing that "where a governmental employee's free exercise claim is one ordinarily subject to strict scrutiny review, the government's special role as employer mandates that the action be reviewed not under the strict scrutiny lens, but using a *Pickering*-like balancing test."); *see also Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986) (applying a less rigorous level of scrutiny to religion-neutral military dress regulation prohibiting wearing yarmulke indoors challenged on free exercise grounds).

October 7, 2004 policy expressly required Muslim female bus drivers to affix a Transit Authority logo to their khimars. (Pl.'s 56.1 Stmt. Ex. 13). Then, shortly after Lewis received notice that she could be reclassified as a station agent, the Transit Authority published a similar policy, dated November 15, 2004, requiring Muslim female station agents to affix a Transit Authority logo to their khimars. (Pl.'s 56.1 Stmt. Ex 15.) Then, on March 29, 2005, the same day that the Transit Authority directed Lewis to attend station agent training, it issued an updated Bulletin expressly requiring Muslim female station agents to affix its logo to the forehead of their khimars. (Pl.'s 56.1 Stmt. Ex. 16.) Lest there be any doubt, that Bulletin also included a black and white illustration of a woman wearing a khimar with a logo on her forehead. (*Id*. at 3.) As in *Lukumi Babalu Aye*, in addition to the text of the policies, "[i]t becomes evident that these [Bulletins] target [khimar wearers] when the [Bulletins]' operation is considered." *Lukumi Babalu Aye*, 508 U.S. at 535. While Lewis and at least three other Muslim women were transferred out of passenger service into to the bus depot, the DOJ observed more than 300 secular violations of the Transit Authority's uniform policy in a mere 11 hours of observation. Balanced against Lewis's First Amendment Rights, the Transit Authority cites its compelling interest in presenting a uniform workforce. But the Transit Authority does not purport to explain how transferring Lewis and other female Muslim bus drivers to the bus depot was tailored to achieve that goal, particularly in light of the evidence of the lax enforcement of its uniform policies. Nor does it purport to explain how the subtle change of location of its logo from forehead to shoulder would, in anyway, impact its ability to present transit riders with a uniform workforce. The evidence in the record thus creates a genuine question of material fact whether the Transit Authority's headwear policies violated Lewis's right to Free Exercise, under either intermediate or strict scrutiny.

### B. *Free Speech Retaliation*

"'To survive a motion for summary judgment on a First Amendment retaliation claim' in the public employment context, 'the plaintiff must present evidence which shows '[1] that the speech at issue was protected, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between the protected speech and the adverse employment action.'" *Nagle v. Marron*, 663 F.3d 100, 105 (2d Cir. 2011) (quoting *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 251 (2d Cir. 2006)). "If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action even in the absence of the protected conduct." *Id.* (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999)) (omission in original). "Since courts do not themselves weigh evidence at the summary judgment stage, this standard requires [a court] to determine whether any reasonable trier of fact would have to conclude that the evidence was so strongly in the defendant's favor that there remained no genuine issue of material fact for it to resolve." *Id.*

In determining whether the speech at issue was protected, this Court is mindful that "the government enjoys significantly greater latitude [in regulating speech] when it acts in its capacity as employer than when it acts as sovereign." *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001). Nevertheless, the First Amendment "prohibits [a public employer] from punishing its employees in retaliation for the content of their protected speech." *Id.*; *see also Munafo v. Metro. Transp. Auth.*, 285 F.3d 201, 211 (2d Cir. 2002) ("The employee's right to be free from such retaliation has been clearly established since at least 1968."). In determining whether a public employee's speech is protected, courts are directed to "to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the

State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Thus, the Supreme Court has held that, to be protected, a public employee's speech must be "on a matter of public concern," which includes speech "relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).

Here, on February 26, 2003, Lewis spoke with the media about the Transit Authority's allegedly discriminatory policy concerning khimars. (Pl.'s 56.1 Stmt. Ex. 93, *Hat's Bias, Muslims Say*, Daily News, February 26, 2003.) This speech clearly addressed a matter of public concern. *See Connick*, 461 U.S. at 146 ("[i]t is clear that [employee's] statements concerning the school district's allegedly racially discriminatory policies involved a matter of public concern."); *Konits v. Valley Stream Cent. High Sch. Dist.,* 394 F.3d 121, 125 (2d Cir. 2005) ("[W]hen a public employee's speech regards the existence of discrimination in the workplace, such speech is a matter of public concern."). As explained above, Lewis alleges that she suffered numerous adverse employment actions. *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 225 (2d Cir.2006) (In the context of a First Amendment retaliation claim, only "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action.") (citation omitted). Finally, to establish causation, Lewis "must show that the protected speech was a substantial motivating factor in the adverse employment action." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 167 (2d Cir. 2006) (internal quotation marks omitted). While alleged causation is not as clear as with Lewis's other claims because she was already working in the bus depot when she spoke with the media, plaintiff has demonstrated that following her interview with the Daily News, Lewis was subjected to repeated incidents of harassment and disparate treatment until she was

eventually reclassified and terminated. The Transit Authority has not attempted to demonstrate, by a preponderance of the evidence, that it would have taken these same actions "even in the absence of [Lewis's] protected conduct." *Nagle*, 663 F.3d at 105. Accordingly, there is a genuine question of material fact whether the Transit Authority impermissibly abridged Lewis's Free Speech rights and summary judgment on these grounds is denied.

## VII.    *Damages Cut-Off*

The Transit Authority contends that damages should be cut-off as of June 3, 2005, because as of that date Lewis was medically unqualified for reclassification to *any* position at the Transit Authority. (Def.'s Br. at 12.) The Transit Authority relies on a medical examination report conducted by a Transit Authority doctor, Dr. Suzanne L. Lim, in 2005 and a declaration from Dr. Lim, dated December 28, 2012, interpreting that report. The report recites Lewis's "Limitations" to be: "Bending/Twisting the trunk, lift/carry/push/pull < 20 lbs No Title Recommendation Any NYCTA vehicle Walking." (Lim Decl. Ex. A at 4). Plaintiff disputes that this evidence establishes that Lewis was unqualified to work as a station agent – a position that plaintiff contends Lewis was medically able to perform. The report does not expressly state that Lewis was unable to work as a station agent on June 3, 2005. Even if it did, it does not establish that Lewis remained unable to perform the job of a station agent after June 3, 2005. Having examined the proof in support of and in response to the Transit Authority's argument, the Court concludes that questions of fact remain and accordingly, at this time, plaintiff's damages will not be extinguished as of June 3, 2005.

## CONCLUSION

For the forgoing reasons, the Transit Authority's motion for summary judgment is denied in its entirety.  The plaintiff's motion to strike portions of the Transit Authority's reply brief or in the alternative, for leave to file a surreply, is denied.

**SO ORDERED.**

_____S/_____
SANDRA L. TOWNES
United States District Judge

Brooklyn, New York
Dated:  March 31, 2014